## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS CASTAGNA,<br>      *Plaintiff*,<br><br>           v.<br><br>SCOTT M. SANSOM *et al.*,<br>      *Defendants*. | No. 3:21-cv-1663 (JAM) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Thomas Castagna was a police officer for many years in East Hartford, Connecticut. But he was disciplined about two dozen times and ultimately fired from his job in 2020. Castagna grieved his termination through his labor union to the State Board of Mediation and Arbitration, but the Board ruled that there was just cause for the termination of his employment.

Now Castagna has filed this federal lawsuit claiming that he was subject to retaliation for the exercise of his First Amendment rights. He alleges that he was disciplined and terminated because he complained about certain police department practices and because he was an active member and officer of the police union.

Castagna has named as defendants the Town of East Hartford, the East Hartford police chief (Chief Scott Sansom), and two supervisory East Hartford police officers (Lt. Michael DeMaine and Lt. Joseph Ficacelli). The defendants in turn have moved for summary judgment.

I conclude that Castagna did not engage in protected speech when he complained about a particular police patrol policy in 2018. I also conclude that there is no genuine issue of fact to show that Castagna's exercise of First Amendment rights caused his discipline or termination. Castagna's remaining derivative claims fail for the same reasons as his First Amendment claim. Accordingly, I will grant the defendants' motion for summary judgment.

1

## BACKGROUND

Castagna served as an East Hartford police officer for more than two decades until he was fired in 2020.[1] He was also a member of the police union throughout his years as a police officer and served as a union trustee from 2009 to 2011 and then as union secretary from 2011 to January 2019.[2] The union secretary position was an elected position in which he represented police officers in numerous capacities, including grievances, advocacy, and monitoring the collective bargaining agreement.[3]

Castagna's service with the police department was marred by frequent disciplinary actions. As discussed below, there was a combination of five disciplinary actions in early 2020 that ultimately culminated in the termination of his employment. But even before then, Castagna was subject to twenty instances of disciplinary sanctions from November 2000 to January 2020,

---

[1] Doc. #83-1 at 1–3 (¶¶ 1–2, 4). The facts set forth in this ruling are mostly drawn from the parties' respective statements of undisputed facts and, in particular, the single document that combines the defendants' statements with Castagna's statements in response to the defendants' statements and his additional statement of material facts. *See* Doc. #83-1. To the extent that the defendants set forth facts that are adequately supported by record citations and not controverted by Castagna's citation to other facts in the record, I accept those facts as true for purposes of this ruling. *See* D. Conn. L. Civ. R. 56(a)(3). Castagna repeatedly raises three objections to the defendants' fact statement. First, he objects that the defendants have combined more than one fact within each numbered paragraph of their statement of material facts. I will overrule this objection. Although the rule requires separately numbered paragraphs and a concise statement of each material fact, I do not interpret the rule to limit a party to stating only a single fact in each numbered paragraph. Second, Castagna objects that various documents cited and included by the defendants have not been formally authenticated. I will overrule this objection because the defendants have since filed an authentication certification, *see* Doc. #93-2, and in any event the records may be properly considered in the absence of any reasons shown to suggest that they are not genuine. *See Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 F. App'x 90, 93–94 (2d Cir. 2019) (rejecting claim that documents not properly authenticated for summary judgment). Third, Castagna objects that the defendants have failed to provide citations to specific pages or paragraphs of documents cited. *See* Doc. #83-1 at 11–25 (¶¶ 26–27, 29–36, 38–39, 42, 44, 46–51), 27–44 (¶¶ 56–60, 62–70, 72–75, 79–85). I sustain this objection, because Local Rule 56(a) requires parties to "cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." D. Conn. L. Civ. R. 56(a)(3). Although I have been able to independently review the cited documents to find the relevant page numbers, defense counsel's failure to comply with this basic requirement has needlessly impeded an efficient review of the summary judgment motion and falls well below what I would expect from experienced counsel. Despite the defendants' failure in this respect, however, I do not conclude that the prejudice is sufficient to warrant sanctions or denial of the defendants' summary judgment motion.

[2] Doc. #83-1 at 4 (¶ 8), 6 (¶ 15).

[3] *Id.* at 45 (¶ 5).

including eight suspensions without pay.[4] His prior disciplinary actions included several counts

of insubordination and failure to promptly submit reports.[5] At least seven of the twenty

disciplinary actions, including a discharge in 2005 that was converted to a suspension without

pay, were imposed before Castagna began serving as a union officer in 2009.[6]

Castagna's First Amendment claim is based in part on a union grievance he filed in

March 2018 concerning a change in police patrol assignment policy. Around March 11, 2018, Lt.

DeMaine announced that he was going to assign patrol districts to field training officers at roll

call—a change to the customary practice of letting officers select their patrol districts by

seniority.[7] Castagna told Lt. DeMaine that the practice would violate the police department's

collective bargaining agreement with the union, and he subsequently complained to a deputy

police chief.[8]

Within this same timeframe, Castagna and Lt. DeMaine clashed over a different issue. On

March 23, 2018, Castagna had an argument with Lt. DeMaine after Lt. DeMaine confronted him

about the fact that Castagna could not be reached for approximately ninety minutes while he was

on administrative duty at the station house.[9] Lt. DeMaine's report of the encounter states that

after he ordered Castagna to help with front desk duties, Castagna refused the order, invited Lt.

---

[4] *Id.* at 1–3 (¶¶ 3–4); Doc. #75-5 at 4–6 (arbitration decision listing 20 adverse disciplinary findings against Castagna from November 2000 to January 2020). Although Castagna raises a hearsay objection to his prior disciplinary records, an exception to the rule against hearsay allows a public office record that "sets out . . . in a civil case . . . factual findings from a legally authorized investigation[,] and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).

[5] Doc. #75-5 at 5–6.

[6] *Id.* at 5 (listing disciplinary actions prior to 2009); *see also* Doc. #75-21 at 13 (Castagna deposition testimony: "Q. Even when you were not a union official you were still subject to at least I think we're at eight or ten different IAs, correct? A. Correct.").

[7] Doc. #83-1 at 46 (¶ 9).

[8] *Id.* at 16–17 (¶ 36), 47 (¶¶ 12–14); Doc. #83-4 at 26–28.

[9] Doc. #83-1 at 12 (¶¶ 28–29), 14 (¶ 32). Castagna denies that he left the police headquarters without a radio for more than an hour and half; rather, he asserts that he left the building and not the police department's campus, though he does not dispute that he was absent from his desk. *Id.* at 12 (¶ 28).

DeMaine to write him up, and stated that he was going home.[10] During this exchange, Lt. DeMaine called Castagna a "piece of shit" and "a fucking asshole."[11]

On March 24, Lt. DeMaine filed an Internal Affairs complaint against Castagna for insubordination.[12] On March 28, Chief Sansom directed Lt. DeMaine to conduct an investigation into the complaint.[13]

Then on March 30, 2018, Castagna filed grievances against Lt. DeMaine on behalf of the union, alleging that Lt. DeMaine's new assignment practice violated the collective bargaining agreement.[14] Although Chief Sansom denied these grievances in April and June 2018, the State Board of Mediation and Arbitration eventually ruled in March 2019 in the union's favor, finding that the new assignment practice violated the collective bargaining agreement.[15]

Castagna was thus vindicated by the State Board with respect to the merits of his complaint about Lt. DeMaine's patrol district assignment practices, but he was not exonerated for his insubordination to Lt. DeMaine arising from their argument on March 23, 2018. On July 20, 2018, Chief Sansom sustained the insubordination charge against Castagna and ordered a counseling session with him as discipline.[16]

---

[10] Doc. #75-7 at 3.

[11] Doc. #83-1 at 49 (¶ 30); Doc. #83-4 at 21–22.

[12] Doc. #83-1 at 14–15 (¶ 33); Doc. #75-7 (reference number IA 18-03).

[13] Doc. #83-1 at 15–16 (¶ 34).

[14] Doc. #83-1 at 16–17 (¶ 36); Doc. #75-8 at 3. In his amended complaint, Castagna claims that he filed Grievance #386-462 on March 23, but the record of Grievance #386-452 lists March 30 as its filing date. *Compare* Doc. #18 at 3 (¶ 13), *with* Doc. #75-8 at 3. Castagna objects that the compilation of his 2018 grievances to Sansom and Sansom's responses, Doc. #75-8, is unauthenticated. *See* Doc. #83-1 at 16–21 (¶¶ 36, 38, 40, 42). The records in Doc. #75-8 bear sufficient indicia of authenticity, such as the Town letterhead, official police department stamps, and Sansom's signature, and can be easily authenticated during trial. Accordingly, I will consider the records in Doc. #75-8 for purposes of summary judgment.

[15] Doc. #83-1 at 19–21 (¶¶ 39–40, 42), 48 (¶ 20); Doc. #75-8 at 2, 6, 16–19.

[16] Doc. #83-1 at 21 (¶ 43). Although Castagna denies this factual statement, his denial cites no contrary evidence to dispute that Chief Sansom found Castagna had engaged in insubordination and ordered counseling as reflected in Chief Sansom's written finding. Doc. #75-7 at 13.

The following year and a half involved many more internal investigation complaints against Castagna. Between July 2018 and December 2019, Castagna was the subject of six more internal investigations, two of which led to a cumulative three days of suspension without pay.[17] The other investigations resulted in written reprimands or counseling.[18]

Castagna's First Amendment claim is also based in part on a second complaint he made in 2019 to protest another change in police practices. In August 2019, Lt. DeMaine began to call in overtime shift patrol officers before the midnight shift patrol officers began their shift—a change to the prior practice of calling in the overtime shift patrol officers after the midnight shift started its patrol duty.[19] At some point in 2019, Castagna verbally complained to two of the deputy police chiefs that Lt. DeMaine's early call-in of the overtime officers left the town inadequately protected before the midnight shift officers began their shift.[20]

Lt. DeMaine was aware of Castagna's complaints.[21] At some point, Lt. DeMaine told another officer that "once Castagna's case is over, we'll go back to the way it was, which is when midnight signs on you come in."[22] According to Castagna, however, he did not file a union grievance to protest the new policy of early call-ins, and by January 2020 the new practice of early call-ins of overtime officers was stopped.[23]

---

[17] Doc. #83-1 at 21–24 (¶¶ 44–50); Doc. #75-5 at 6 (¶¶ 14–19) (arbitration decision listing each investigation,); Doc. #75-9 (underlying disciplinary report materials).

[18] Doc. #75-5 at 6.

[19] Doc. #83-1 at 48–49 (¶¶ 22–24).

[20] *Id.* at 27 (¶ 54). Castagna's briefing states he raised his complaint "in the summer or fall of 2019." Doc. #83 at 13.

[21] Doc. #83-1 at 27–28 (¶ 56); Doc. #83-13 at 15–16.

[22] Doc. #83-15 at 11. It is unclear what Lt. DeMaine meant when he referred to "Castagna's case." The defendants argue that the "case" refers to Castagna's employment termination grievance, which was filed in 2020, and thus that the comment was made after Castagna was fired. Doc. #75-30 at 4–5; Doc. #77-2 at 28–29. Castagna does not make any explicit allegations regarding the timing of the comment. *See* Doc. #83 at 16; Doc. #83-1 at 49 (¶ 28).

[23] Doc. #83-4 at 38; Doc. #18 at 5 (¶ 28) ("Subsequently, on or about January 2020, the unsafe practice stopped").

At the beginning of 2020 Castagna was subject to another series of five internal investigations—all of which were considered together for purposes of imposing discipline. Because these five investigations were the stated grounds for the ultimate decision to terminate Castagna's employment, I will review each one in turn.

The first investigation arose from Castagna's alleged misconduct at the *beginning* of his shift on January 25, 2020. A police sergeant filed an Internal Affairs complaint alleging that Castagna had failed to report to the watch commander and to complete his car inspection sheet at the beginning of the shift.[24]

Chief Sansom assigned Lt. Joseph Ficacelli to investigate this complaint, which included interviewing Castagna.[25] After Lt. Ficacelli concluded that Castagna lied twice during his interview (about being delayed because he stopped for gas and knowing that he must report in person to the watch commander), Lt. Ficacelli added disciplinary charges of untruthfulness to the original charges of violating police department rules on the use of police vehicles, intradepartmental communication, and responsibilities and general conduct on duty.[26]

The second disciplinary investigation stemmed from Castagna's conduct at the *end* of his January 25 shift. At 10:36 pm, a police sergeant ordered Castagna to report back to the headquarters, but Castagna did not return until 11:11 pm.[27] Castagna then submitted his overtime sheet indicating that his shift ended at 11:30 pm, even though he should have indicated that his shift ended at 11:15 pm at the latest.[28] Castagna argued with Lt. DeMaine when asked why he

---

[24] Doc. #83-1 at 30–32 (¶¶ 60, 62).
[25] *Id.* at 31–32 (¶ 62); Doc. #75-11 (reference number PSB 2020-009).
[26] Doc. #75-11 at 27–35; Doc. #83-9 at 30.
[27] Doc. #83-1 at 32 (¶ 63).
[28] *Id.* at 33 (¶ 64); Doc. #75-12 at 28 (¶ 63).

did not report back as ordered and, at one point during the exchange, Castagna commented that "this is not the Mike DeMaine Pie Factory, this is the town of East Hartford."[29]

Lt. DeMaine filed an Internal Affairs complaint against Castagna regarding the incident, and Chief Sansom again assigned Lt. Ficacelli to investigate.[30] Lt. Ficacelli interviewed Castagna and concluded that he lied during his interview (claiming that he had been delayed in returning to the police station because he was helping a lost motorist), resulting in charges that included four counts of untruthfulness, failure to treat other officers with respect, and incorrectly filling out an overtime sheet.[31]

In light of the untruthfulness charges added by Lt. Ficacelli during these investigations, Chief Sansom placed Castagna on administrative leave on February 7, 2020.[32] But while he was on leave, three more complaints were lodged against Castagna.[33]

One complaint involved a citizen complaint on February 17, 2020, about a police report that Castagna completed regarding a January 16, 2020 incident; a sergeant who conducted an investigation of the complaint concluded that Castagna violated multiple general orders related to accurately and timely completing reports.[34]

Another complaint involved a report on February 20, 2020 from the department's record division that one of Castagna's traffic tickets was not complete; a sergeant who conducted an

---

[29] Doc. #83-1 at 33 (¶¶ 64–65); Doc. #75-12 at 12–13.
[30] Doc. #83-1 at 34 (¶ 66); Doc. #75-12 at 38 (reference number PSB 2020-008). The defendants claim that Caruso filed the complaint, but both the investigative report and the complaint form list Lt. DeMaine as the complainant. *Compare* Doc. #83-1 at 34 (¶ 66), *with* Doc. #75-12 at 2, 38.
[31] Doc. #83-1 at 35–36 (¶¶ 69–70); Doc. #75-12 at 29–34.
[32] Doc. #83-1 at 37 (¶ 71).
[33] *Id.* at 37 (¶ 72). The defendants appeared to have confused the reference numbers, claiming that the investigations were IA 2010-021, 2020-022, and 2020-024, but the reports contain the reference numbers PSB 2020-020, 2020-021, 2020-024. Doc. #75-13 at 2; Doc. #75-14 at 2; Doc. #75-15 at 2.
[34] Doc. #83-1 at 37–38 (¶ 73).

investigation of this complaint concluded that Castagna did not properly complete the ticket despite having ample opportunity to do so during subsequent shifts.[35]

The last of the complaints involved a report on March 16, 2020 from a court officer that Castagna had not made necessary corrections ordered by a court to a family violence arrest warrant; a sergeant who conducted an investigation concluded that Castagna violated general orders pertaining to completing reports.[36]

On May 1, 2020, Chief Sansom sustained charges against Castagna from all five of these investigations and terminated his employment.[37] All in all, the charges included five counts of untruthfulness, three counts of insubordination, failure to treat other officers with respect, violation of a rule regarding family violence arrests, and multiple counts of failure to submit reports.[38] Although Chief Sansom testified that he considered "the totality of everything" in his decision to terminate Castagna, he noted that he likely would not have terminated Castagna had it not been for his untruthfulness during the investigation interviews with Lt. Ficacelli.[39]

Pursuant to his rights under the collective bargaining agreement, Castagna grieved his termination to the State Board of Mediation and Arbitration.[40] The Board provided the opportunity for the parties to appear, offer testimony and evidence, cross-examine, and file post-

---

[35] *Id.* at 38–39 (¶ 74).

[36] *Id.* at 39 (¶ 75).

[37] *Id.* at 40 (¶ 76); Doc. #75-17 at 2 (termination notice dated May 1, 2020). Castagna does not dispute that Chief Sansom terminated his employment but asserts that it was "in retaliation for his complaints regarding Demaine's [field training officer] assignments and Demaine's unsafe removal of officers from patrolling the streets of East Hartford." Doc. #83-1 at 40 (¶ 76). Notably, he does not claim at this point that Chief Sansom terminated him because of his union association or union activity. He also concedes that there were other police officials—Sgt. Spragg and Sgt. Caruso—who filed some of the disciplinary actions, *see ibid.*, although he has not named them as defendants in this lawsuit.

[38] Doc. #75-5 at 9–14 (¶¶ 10–14).

[39] Doc. #83-1 at 40 (¶ 77); Doc. #75-28 at 8–9. Castagna denies the truth of Chief Sansom's testimony about his reasons for terminating Castagna's employment but does not deny the fact of the testimony.

[40] Doc. #83-1 at 40 (¶ 78); Doc. #75-5 at 3–4.

hearing and reply briefs.[41] Hearings were held on five different dates, at which both parties had representation.[42]

By decision dated April 20, 2021, the Board found that there was just cause for the Town to terminate Castagna's employment:

> The Town has the burden to prove by a preponderance of the evidence that it had just cause to terminate the grievant's employment. It has amply demonstrated such. It is appropriate and necessary to view the results of the five investigations resulting in this termination in the glaring light of the grievant's significant history of twenty-two prior disciplinary events. Although the discipline began some twenty years ago, it marches to a steady beat of failures to perform some simple duties of the job to acts of insubordination. The vast majority of these were not grieved. . . . The five investigations which form the basis of the termination here present a wide range of actionable behavior. The occurrences of insubordination and dishonesty are the most serious and each provide a sufficient basis to sustain the termination.[43]

The Board's decision described at length the evidence for each of the five investigations to show that Castagna violated department rules, engaged in acts of subordination, and was dishonest in his explanations including during investigative interviews.[44]

The Board first described numerous "acts of insubordination" that "are clearly unacceptable in any work environment, let alone a police para-military one" and added that these acts followed "six prior disciplinary measures involving insubordination."[45] "These clear,

---

[41] Doc. #75-5 at 3.
[42] *Id.* at 2–3.
[43] *Id.* at 17.
[44] *Id.* at 7–14.
[45] *Id.* at 17.

unexplained, inexcusable acts of insubordination taken cumulatively are sufficient as a bundle to support a finding of just cause for termination."[46]

The Board went on to describe "the incidents of the grievant's lying and/or demonstrations of a capacity to embrace a very blurry relationship with reality and the truth."[47] It noted that "[a]ll of these prevarications, resulting from whichever p[s]yc[h]ological posture, stand as a separate and sufficient ground for termination."[48] It also observed that these instances of untruthfulness would be required to be disclosed to defendants in criminal case matters and that "[s]ociety, judges, juries and defendants must be able to rely upon the truthfulness of the police," but that Castagna "violated that essential promise."[49]

In addition, the Board described Castagna's various defenses in which he disputed various accounts of misconduct as well as his claims that a "recent divorce had a profound and distracting impact" and "that Sgt. Spragg and Lt. Demaine held personal animosity toward [him]."[50] So far as the Board's decision reflects, Castagna did not argue before the Board that he was terminated in order to retaliate against him for complaining about the changes in police practice in March 2018 or August 2019 or for his association with and activities on behalf of the union.[51]

---

[46] *Ibid.*

[47] *Ibid.*

[48] *Id.* at 18.

[49] *Ibid.*; see also *id.* at 15 (noting argument of East Hartford that "the cases of *Brady v. Maryland,* 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972) render the grievant's continued employment with the Department untenable," because "[t]hese cases found that due process requires the state prosecution to divulge any exculpatory evidence to the defense" and that "[t]his would require the disclosure of the grievant's untruthfulness in any matter in which he is involved").

[50] *Id.* at 16.

[51] *Ibid.*; *see also* Doc. #83-1 at 41 (¶ 80) (undisputed fact that "[t]he Union did not argue that the five [internal affairs investigations] were the result of any retaliatory conduct on behalf of the Department management, but rather that 'Sgt. Spragg and Lt. DeMaine held personal animosity' toward Plaintiff").

In February 2022, East Hartford moved in the Connecticut Superior Court to confirm the Board's decision.[52] The union filed no objection, and the state court confirmed the Board's decision in March 2022.[53]

In the meantime, Castagna filed this federal lawsuit in December 2021 against East Hartford, Chief Sansom, Lt. DeMaine, and Lt. Ficacelli.[54] Count One of the amended complaint alleges a First Amendment claim for retaliation based on Castagna's complaints about police department practices in March 2018 and August 2019 and because of his union membership and activity.[55] Count Two alleges a Fourteenth Amendment equal protection claim that the defendants selectively enforced discipline against him because of his exercise of constitutional rights.[56] Lastly, Count Three alleges a claim for municipal liability against East Hartford on the basis of the individual defendants' unlawful conduct.[57] The defendants have moved for summary judgment on all three claims.[58]

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing

---

[52] Doc. #83-1 at 44 (¶ 86).
[53] *Ibid.*
[54] Doc. #1.
[55] Doc. #18 at 8.
[56] *Id.* at 8–9.
[57] *Id.* at 9–10.
[58] Doc. #76.

party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 655–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).[59]

### Count One – First Amendment retaliation

The First Amendment bars retaliation because of a person's exercise of rights under the First Amendment. In order to prevail on a First Amendment retaliation claim, a plaintiff must establish the following three elements: "(1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020). As to this last element of causation, a defendant may defeat a plaintiff's claim of a causal connection by showing that the defendant would have taken the same adverse action against the plaintiff even if the plaintiff had not exercised his or her First Amendment rights. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). I will address the law and evidence as to each element in turn.

### First element – protected speech or association activity

The first element is whether Castagna engaged in speech or conduct that is protected by the First Amendment. Castagna was a public employee. Because a government employer—like any employer—has the right to maintain a reasonably efficient and orderly work environment, it may restrict or penalize the speech of its own employees in ways that it could not if the government were regulating the speech of the citizenry in general. *See Ricciuti v. Gyzenis*, 834 F.3d 162, 167–68 (2d Cir. 2016); *Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016). For this

---

[59] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

reason, a public employee's statements are not protected by the First Amendment from retaliation unless "the employee spoke as a private citizen" rather than as an employee *and* unless "the speech at issue addressed a matter of public concern." *Montero v. City of Yonkers*, 890 F.3d 386, 393 (2d Cir. 2018) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

As noted above, Castagna's free speech claims are based on two sets of complaints he made in 2018 and 2019 about changes in police department practices. In March 2018 he filed a union grievance to object to Lt. DeMaine's practice of allowing field training officers at roll call to select what districts they wished to patrol rather than allowing officers to select their patrol districts by seniority. As an initial matter, I assume there is a genuine issue of fact about whether Castagna's filing of a union grievance meant that he spoke as a citizen rather than as an employee. *See Montero*, 890 F.3d at 399 (stating that "under the facts of this case as set out in the amended complaint, when Montero spoke in his capacity as a union member, he spoke as a private citizen" and that "his union speech was not composed of statements made as a means to fulfill or undertaken in the course of performing his responsibilities as a police officer").

Still, however, there is no genuine fact issue to suggest that Castagna's complaint of March 2018 involved a matter of public concern. "To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community." *Ibid.* Put differently, "the speech must be fairly considered as relating to any matter of political, social, or other concern to the community and be of general interest or of legitimate news interest." *Agosto*, 982 F.3d at 95. And the "forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern because a petition filed with an employer using an internal grievance

13

procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Ibid.*

The fact that a complaint is couched in the form of a union grievance does not mean that the complaint is of public concern. "Labor versus management disputes, needless to say, almost invariably involve a conflict between the labor force and management over an issue that concerns the terms and conditions of employment," and "[s]uch disputes often have a strong flavor of 'personal grievance' notwithstanding that the personal grievance is shared by numerous employees." *Lynch*, 811 F.3d at 581.

Thus, not "all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union." *Id.* at 582. And so, for example, the Second Circuit has ruled that various union grievances—such as protesting an internal procedure for altering teachers' planning periods, denying a request for copies of past school budgets, complaining about an administrator's effort to send a staff member to learn about what was happening at a union meeting, and protesting alleged retaliation against a plaintiff for representing other teachers during union activity—were not matters of public concern. *See Agosto*, 982 F.3d at 95–97.

For the same reasons, there was no public concern implicated by Castagna's union grievance in 2018. The public had no general interest in whether the East Hartford police department assigned patrol districts by means of letting the most senior officers decide where they would patrol or by means of allowing field training officers to decide where they would patrol.

Castagna makes no real argument to the contrary. In his deposition he testified that the concern behind his grievance was not "officer safety" but that the change in assignment policy

14

was objectionable merely because it was a change from "past practice" of assigning by means of seniority.[60] Therefore, insofar as Castagna bases his First Amendment retaliation claim on his union grievance in March 2018, his claim fails for lack of evidence to show that he engaged in protected speech on a matter of public concern.

By contrast, a different conclusion follows for Castagna's later complaint about a change of practice in August 2019 to recall overtime officers from their shifts prior to the start of the midnight shift. Because this change involving the deployment of fewer police officers during late night hours arguably affects community safety, the defendants do not dispute for present purposes that there is a genuine issue of fact to show that Castagna's complaint was as a citizen on a matter of public concern and within the protection of the First Amendment.

In addition, it is not disputed that Castagna was a union member throughout his employment and served in a union leadership role from 2009 to January 2019. The First Amendment right to association protects a public employee from retaliation on the basis of his or her union membership and activities. *See Donohue v. Milan*, 942 F.3d 609, 617 (2d Cir. 2019).

In short, Castagna may not base his First Amendment claim on any retaliation for the complaint he raised in March 2018 about patrol district assignments. On the other hand, there remains a genuine issue of fact to show that Castagna's later complaint in 2019 about the early recall of overtime officers before the midnight shift was protected by the First Amendment and that more generally his union membership and union activities were also protected by the First Amendment.

---

[60] Doc. #83-4 at 31.

### *Second element – adverse action*

The second element for a First Amendment retaliation claim is whether the defendant subjected the plaintiff to an adverse action. An "adverse action" means any action by a defendant that would deter a person of ordinary firmness from exercising his or her First Amendment rights. *See Heim v. Daniel*, 81 F.4th 212, 221 n.9 (2d Cir. 2023); *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

The Supreme Court has recently explained that "[s]ome adverse actions may be easy to identify—an arrest, a prosecution, or a dismissal from governmental employment," but that "[d]eprivations less harsh than dismissal can sometimes qualify too," yet "no one would think that a mere frown from a supervisor constitutes a sufficiently adverse action to give rise to an actionable First Amendment claim." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Second Circuit in turn has ruled that "[a]n adverse employment action may include discharging, refusing to hire, refusing to promote, demoting, reducing the pay, or reprimanding an employee." *Montero*, 890 F.3d at 401; *see also Connelly*, 61 F.4th at 326 ("While it is true that our cases have often mentioned reprimands when listing examples of adverse employment actions, we have also emphasized that not all criticism of an employee rises to the level of an adverse employment action" and that "[t]he question of whether a particular criticism or reprimand qualifies as an adverse employment action will often be a fact-intensive inquiry for the jury.").

There is no dispute that the termination of Castagna's employment in 2020 qualifies as an adverse action. On the other hand, Castagna is vague about what—if any—additional adverse actions occurred that he believes were in retaliation for the exercise of his First Amendment rights.

16

In any event, the statute of limitations restricts what adverse actions may be relied on by Castagna. His constitutional claim for relief under 42 U.S.C. § 1983 is subject to a three-year statute of limitation. *See Clark v. Hanley*, 89 F.4th 78, 86 (2d Cir. 2023). Because he did not file this lawsuit until December 2021, he may seek recovery only for adverse actions that occurred from December 2018 and later. Nor is there any merit to his suggestion that the statute of limitations should be extended under the "continuing violation" doctrine, because it is clear that each disciplinary incident against Castagna was a discrete act. *See Gonzalez v. Hasty*, 802 F.3d 212, 220–22 (2d Cir. 2015). Thus, Castagna cannot rely on the disciplinary investigation and action for insubordination that occurred from March to July 2018.

Within the permissible timeframe of the statute of limitations and apart from the five disciplinary proceedings in early 2020 that led to the termination of Castagna's employment, the record reflects that Castagna was subject to six more disciplinary proceedings from December 2018 to January 2020, which resulted in three suspensions without pay of one or two days, two written reprimands, and one disciplinary counseling.[61] It is unclear to me that Castagna has preserved any claim that these six disciplinary proceeding were adverse actions caused by any of the defendants' retaliatory motives. But because the outcome of this ruling turns on factors other than whether particular acts of the defendants qualify as adverse actions, I will assume without deciding that these six disciplinary actions qualify as additional adverse actions.

### Third element - causation

The third element for a First Amendment retaliation claim is causation. There must be a causal connection between the exercise of a plaintiff's First Amendment rights and the adverse action he experienced. As the Second Circuit has recently explained, "[t]o show causation, a

---

[61] Doc. #75-5 at 6.

plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action," but "[b]ecause protected speech could not substantially cause an adverse action if the employer would have taken that action in any event, a defendant can rebut a *prima facie* showing of retaliation by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Heim*, 81 F.4th at 222; *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118–19 (2d Cir. 2015) (same). In light of this two-part standard, I will first discuss Castagna's claim in support of his *prima facie* claim of causation before turning to the defendants' claim that they would have engaged in the same adverse actions regardless of Castagna's exercise of his First Amendment rights.

Causation can be established either "directly by evidence of retaliatory animus" or "indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment." *Morales v. City of New York*, 2022 WL 2840035, at *2 (2d Cir. 2022) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). "A plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link" but instead must "produce some tangible proof to demonstrate that [his] version of what occurred was not imaginary." *Ibid.* (quoting *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)).

In terms of direct evidence of retaliatory animus, Castagna points to various conflicts he had with the individual defendants, but he does not point to any particularly probative evidence that they bore animus against his exercise of his First Amendment rights to free speech or his membership in and activities in support of the police union. As to his First Amendment speech claim, he does not point to evidence that Chief Sansom, Lt. DeMaine, or Lt. Ficacelli were upset with or sought to retaliate against Castagna because he complained about the August 2019

change in practice with respect to the early call-in of overtime officers before the midnight shift.[62]

As to his First Amendment union association claim, he points only to various personality conflicts rather than any direct evidence of animus against him by any of the defendants because of his union membership and participation. For example, Castagna highlights various disputes and insults between a former union president (Frank Iacono) and Lt. Ficacelli and Lt. DeMaine.[63] But this evidence is at least equally consistent with a personality conflict as it is with any union animus on the part of Lt. Ficacelli and Lt. DeMaine. Moreover, even if Iacono "policed the [union] contract vigorously to the consternation of management" at the police department, this does little to suggest that any of the named defendants—as distinct from Iacono—harbored animus against Castagna on the basis of his membership and activities with the police union.[64]

Castagna fares no better as to Chief Sansom. He cites only conclusory opinion testimony of one witness that "Chief Sansom's relationship with the union" was "[n]ot good" because "it's a relationship that's adversarial by its very nature," and because "[w]e're on different sides of something."[65] Notwithstanding Castagna's union leadership role from 2009 to January 2019, he

---

[62] Doc. #83-4 at 34-43 (Castagna deposition testimony re early call-in practice). Instead, Castagna cites evidence of conflicts following his complaint in March 2018 about the assignment of patrol districts. Doc. #83-1 at 49 (¶¶ 29–30) (statements by a non-defendant supervisor that Castagna's "FTO grievance 'disgusted me'" and by Lt. DeMaine following the complaint in March 2018 that Castagna was "a piece of shit"); Doc. #83-4 at 32–33 (Castagna's deposition testimony that Lt. DeMaine "wasn't happy" and "did not agree with the fact that I disagreed with him," although Lt. DeMaine did not say "anything like, you know, I'm going to get you now that you filed this" and agreeing that he "never said anything to you that was threatening after you told him that you disagreed with his interpretation of the collective bargaining agreement"). But, as noted above, Castagna's complaint in March 2018 was not entitled to First Amendment protection, and therefore any alleged retaliation against this complaint is not subject to First Amendment protection.

[63] Doc. #83-1 at 7–8 (¶¶ 17–18); *see also id.* at 50 (¶¶ 31–35) (further examples of Iacono statements about Lt. Ficacelli and Lt. DeMaine).

[64] *Id.* at 7 (¶ 17).

[65] *Ibid.*

has conceded that Chief Sansom "treated him fairly and objectively from 2014-2018."[66]
Castagna does not point to direct evidence that Chief Sansom wished to retaliate against him for
exercising free speech or his membership and activities with the union.

As for Lt. DeMaine and Lt. Ficacelli, Castagna does not dispute their deposition
testimony that both of them were members of the police union until 2020.[67] Their membership in
the union makes it far less tenable to conclude that any adverse actions they engaged in were
because of Castagna's membership or support of the union.

As noted above, a plaintiff may also rely on indirect or circumstantial evidence to show
retaliatory motive. One such type of circumstantial evidence is for a plaintiff to show that there
were similarly situated co-employees who were treated differently. *See Hicks v. Baines*, 593 F.3d
159, 171 (2d Cir. 2010); *Gronowski v. Spencer*, 424 F.3d 285, 295 (2d Cir. 2005). The
comparators must be similarly situated to the plaintiff in all material respects, which means that
there must be a reasonably close resemblance of the facts and circumstances of the adverse
actions across the plaintiff's and comparators' cases. *See Radwan v. Manuel*, 55 F.4th 101, 132
(2d Cir. 2022).

Therefore, in order for Castagna to rely on comparator evidence, he must point to
comparators who were *not* subject to the same or similar discipline and termination as he was
despite engaging in the same or similar (or worse) acts of alleged misconduct. Moreover, the
comparison extends not just to the similarity of the alleged acts of misconduct but also to the
similarity of the plaintiff's and comparators' prior record of discipline. *See, e.g.*, *Saji v. Nassau
Univ. Med. Ctr.*, 724 F. App'x 11, 18 (2d Cir. 2018) (plaintiff "possessed a disciplinary record

---

[66] *Id.* at 6 (¶ 14).
[67] Doc. #77-2 at 3.

and was the subject of multiple complaints" but presented "no evidence" that the proposed comparators "had similar disciplinary histories").

As discussed above, Castagna's termination resulted from a combination of five different disciplinary investigations in 2020. Among the violations were Castagna's five acts of untruthfulness (including during investigation interviews), three acts of insubordination, and failure to correct and resubmit a family violence arrest warrant. All this was against a prior disciplinary history involving twenty investigations and eight suspensions without pay, including a prior termination that was converted to a suspension.[68]

The multiple comparators identified by Castagna do not share his extensive disciplinary history. For example, Jose Santiago was given a "last chance agreement" in 2022 after he was charged with carrying a firearm while intoxicated and breaching the peace, but he had only one other charge for a similar incident seven years before while working for a different police department.[69] Similarly, Kwanza Clayton was disciplined without being fired in 2021 after testing positive for cannabis, but his two prior offenses occurred over five years earlier.[70] Nestor Caraballo and Jose Cortes were never formally investigated or disciplined for making false statements, but Castagna does not allege that they were untruthful at an investigation interview or in multiple instances.[71] And although Mark Visconti was not terminated, he had a single

---

[68] Doc. #75-5 at 4.

[69] Doc. #83-1 at 52 (¶ 51); Doc. #83-23 (Santiago disciplinary materials from 2015); Doc. #83-27 (Santiago "last chance" agreement from 2022). Santiago—like Castagna—was also a member of the police union, *see* Doc. #83-22 at 5, so in this respect Castagna's effort to compare himself to Santiago hurts Castagna's argument that there was any causal connection between his membership in the union and the termination of his employment.

[70] Doc. #83-1 at 53 (¶ 53); Doc. #83-30 (Clayton 2012 incident materials); Doc. #83-31 (Clayton 2014 incident materials); Doc. #83-32 (Clayton 2021 incident materials).

[71] Doc. #83-1 at 53 (¶¶ 52, 54); Doc. #83-33 (Cortes 2019 investigation report involving rear-ending of another vehicle); Doc. #83-28 (Caraballo 2018 investigation report involving unaccounted for absence). The investigation materials for Caraballo reflect that he asserted his right to union representation during the internal investigation. Doc. #83-28 at 3. The fact that Caraballo was not disciplined or fired therefore undercuts Castagna's claim that he was subject to discipline and firing because of his union association.

offense of drunken breach of the peace in Florida and no prior disciplinary history.[72] In sum, Castagna's comparator evidence does not establish a genuine fact issue to suggest that his discipline and termination were because of his First Amendment rights.

Temporal proximity may also be circumstantial evidence of a causal connection between a plaintiff's protected activity and a subsequent adverse action. But the temporal link here is weak. Castagna left his union secretary position in January 2019. Although he remained a union member, he does not allege any later union activity. He complained at some point in 2019 about the August 2019 change in police deployment policy. Yet Chief Sansom did not place him on administrative leave until February 2020 and did not terminate his employment until May 2020.

As the Supreme Court has explained, "[t]he cases that accept mere temporal proximity between an employer's knowledge of the protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*). For pleading purposes, "the passage of up to six months between an adverse action and protected activity [may be] sufficient to permit an inference of causation." *Specht v. City of New York*, 15 F.4th 594, 605 (2d Cir. 2021). But at the summary judgment stage temporal proximity alone is not enough. *See Carr v. New York City Transit Auth.*, 76 F.4th 172, 182 (2d Cir. 2023).

And the more months that go by, the weaker any causal inference. A plaintiff who claims adverse action occurred six hours or six days after the exercise of protected speech or association activity has a much stronger claim than the plaintiff who claims adverse action did not occur until six months or more later.

---

[72] Doc. #83-1 at 54 (¶ 59); Doc. #83-37 (Visconti disciplinary report materials).

Castagna was involved in union advocacy beginning in 2009 and was thereafter subject to numerous disciplinary actions that he does *not* claim were retaliatory. Between 2009 and 2018, Castagna was the subject of six disciplinary actions, including a one-day suspension.[73] This is to say nothing of the numerous disciplinary actions against Castagna *before* he became a union official in 2009.

These multiple instances of discipline that Castagna does *not* claim to have been retaliatory further weaken any inference that there was a causal connection between his union association and the discipline he incurred from December 2018 to January 2020, as well as the final round of investigations in 2020 that led to his termination. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see also Gonzalez v. NYU Langone Hosps.*, 2022 WL 4372199, at *2 (2d Cir. 2022) ("Gonzalez's extensive history of performance issues and ongoing discipline dating back to 2010—long before her protected activity in 2016— prevent her from establishing an indirect causal connection").

In short, Castagna has not shown a genuine issue of fact—whether through direct or indirect evidence of animus—to carry his *prima facie* burden to show that a substantial motivating factor for his discipline or termination was his exercise of First Amendment rights. But even assuming there was a genuine issue of fact about whether he has carried his *prima facie* burden, the evidence conclusively shows that East Hartford would have terminated Castagna's employment regardless of the exercise of his First Amendment rights.

---

[73] Doc. #75-5 at 5–6.

As an initial matter, there is no question that lying, insubordination, and failure to follow employment policies furnish ample bases for an employer to terminate an employee. *See Moses v. St. Vincent's Special Needs Ctr.*, 2022 WL 972439, at *7 (D. Conn. 2022), *appeal docketed*, No. 22-914 (2d Cir. 2022); *McNeil v. Vradenburgh*, 2021 WL 797657, at *7 (S.D.N.Y. 2021); *Rodriguez v. Long Island Am. Water, Inc.*, 2014 WL 4805021, at *5 (E.D.N.Y. 2014). And "[i]t is well-settled that an unsatisfactory disciplinary history may be a legitimate non-discriminatory reason for an employer's adverse employment action." *Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2020 WL 7239615, at *5 (S.D.N.Y. 2020) (collecting cases).

The State Board of Mediation and Arbitration conducted an extensive evidentiary hearing and issued a detailed ruling establishing that there was just cause under the collective bargaining agreement for East Hartford to terminate Castagna's employment. Although this ruling does not have formal preclusive or *res judicata* effect, the Second Circuit has ruled that such labor arbitration decisions may be highly significant evidence against an employee's later court claim for discrimination or retaliation. "[A] decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination" is "highly probative of the absence of discriminatory intent in that termination." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002). And "to survive a motion for summary judgment," a plaintiff "must present strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Ibid.*

But Castagna does not impugn the impartiality of the Board. Nor apart from technical objections does he adduce evidence to show that the Board's findings of fact were wrong.[74]

It is telling that Castagna did not even argue to the Board that he had been disciplined and terminated because he had spoken out to protest police practices or because of his union membership and activities. The Board's job was to decide if there was "just cause" for his termination—and there was nothing to stop Castagna from arguing to the Board that there was no just cause because of the defendants' constitutionally impermissible retaliatory motives.

 Thus, Castagna "has offered insufficient evidence of causation linking his termination to motives of retaliation or discrimination to overcome the cumulative probative weight of the evidence of a legitimate reason for his discharge and of the final termination decision by the arbitration board." *Ibid.*; *see also Cortes v. MTA New York City Transit*, 802 F.3d 226, 232 (2d Cir. 2015) (re-affirming *Collins* and noting that "when the final decision on discipline or discharge is made by an arbitrator whose lack of bias is conceded, enough evidence linking the employer's motive and the arbitration decision must be proffered to allow a reasonable trier of fact to find that the decision was affected by acts resulting from that motive").

Although the focus of the Board's decision was on whether there was just cause for Castagna's termination, the Board's ruling did not undermine any of the prior disciplinary actions. To the contrary, the Board cited and relied on Castagna's deep history of disciplinary problems. Apart from his challenge to the five disciplinary actions that resulted in his termination, Castagna does not show that any other disciplinary action that occurred within the

---

[74] In his opposition to the defendants' statement of material facts that recites the relevant findings of the Board, Castagna does not cite evidence to contradict the Board's findings. Doc. #83-1 at 40–44 (¶¶ 79–85). Instead, he objects only to the lack of authentication of the Board's decision and that the defendants have lumped too many facts at one time into single paragraphs of the factual recitation. I do not agree for reasons stated earlier in this ruling.

statute of limitations was caused by any intent of the defendants to retaliate against him for exercising his First Amendment rights.

Accordingly, in light of the Board's ruling as well as all of the remaining evidence of record, I conclude that there is no genuine issue of fact either to support Castagna's *prima facie* burden to show causation or to rebut the defendants' burden to show that they would have engaged in the same adverse actions regardless of Castagna's exercise of his First Amendment rights. Therefore, I will grant the defendants' motion for summary judgment as to Castagna's claim for retaliation in violation of the First Amendment.

### *Count Two – Equal Protection*

Count Two of Castagna's complaint alleges that the defendants selectively enforced discipline against him because of "his exercise of constitutional rights and association with the union" and also because of a malicious or bad faith "intent to inhibit and to injure."[75] For selective treatment claims brought under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must prove that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019).

To the extent, however, that Castagna claims that he is a "class of one" who was subject to arbitrary, malicious, or bad faith treatment, the Supreme Court has precluded such claims in the public employment context. *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 607 (2008); *see also Ramirez v. Town of Oxford*, 2022 WL 3646203, at *7–9 (D. Conn. 2022)

---

[75] Doc. #18 at 8–9 (¶¶ 52–58).

(discussing the scope and rationale of *Engquist* and why it extends not only to "arbitrary-based" class-of-one claims but also "malice-based" class-of-one claims).

Therefore, Castagna's selective enforcement claim rises or falls on his claim that he was singled out for mistreatment because of the exercise of his First Amendment rights. But, as discussed above, Castagna has failed to show a genuine fact issue to support his claim for First Amendment retaliation. Accordingly, I will grant the defendants' motion for summary judgment as to Castagna's selective enforcement equal protection claim.

### Count Three – municipal liability

Castagna's third claim alleges that East Hartford should be liable for the defendants' violation of his First Amendment and Equal Protection rights. Under *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658 (1978), a municipality is not liable in *respondeat superior* for the unconstitutional actions of its employees. Instead, *Monell* allows for municipal liability only if an officer's violation of a plaintiff's constitutional rights was caused by a municipal policy, practice, or custom, or if it was caused by a municipality's deliberate indifference and inaction in light of a history of prior similar constitutional deprivations by municipal officers. *See Outlaw v. City of Hartford*, 884 F.3d 351, 372 (2d Cir. 2018).

Castagna has no grounds for a *Monell* claim against East Hartford because he has failed in the first instance to show that any individual officer or agent of East Hartford violated his constitutional rights. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."). Accordingly, I will grant the defendants' motion for summary judgment as to Castagna's claim against East Hartford.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS the defendants' motion for summary judgment (Doc. #76). The Court DENIES as moot the defendants' motion for leave to admit additional evidence (Doc. #94).

The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 18th day of January 2024.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge